# Exhibit A

4/13/2020 8:29 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 42279611
By: Wanda Chambers
Filed: 4/13/2020 8:29 PM

CAUSE NO. _____

| | | |
|---|---|---|
| LUXEYARD, INC. and | § | IN THE DISTRICT COURT OF |
| AMIR MIRESKANDARI, | § | |
| *Plaintiffs*, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| OFFIT KURMAN, P.A. | § | |
| and FRANK NOYES, | § | |
| *Defendants*. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Luxeyard, Inc., ("Luxeyard") and Amir Mireskandari ("Mireskandari"), collectively ("Plaintiffs") in the above-entitled matter, complaining of Defendants Offit Kurman, P.A. ("Offit") and Frank Noyes ("Noyes"), collectively ("Defendants") and would respectfully show as follows:

### I
### DISCOVERY CONTROL PLAN

1.      Based upon this Petition, this case should be controlled by a discovery control plan level 3 pursuant to the Texas Rules of Civil Procedure, Rule 190.4.

### II
### PARTIES

2.      Plaintiff Amir Mireskandari is an individual residing in Harris County, Texas. The last three digits of his driver's license are 185 and the last three digits of his social security number are 296.

3.      Luxeyard is a corporation formed in the state of Delaware, with its principal office in Houston, Texas.

4.      Offit is a Delaware professional corporation formed in the State of Delaware and doing business as a law firm in New Castle County, Delaware, and may be served by  and

through its General Counsel, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808. Defendant may also be served through its counsel Gregory Johnson who represented that he represents Defendant.

5.      Noyes is an attorney licensed to practice law in the State of Delaware and may be served at his principal place of business, Offit Kurman, P.A., 222 Delaware Avenue, Suite 1105, Wilmington, Delaware, 19801, or at his home address of 25 Green Valley Rd., Unit 5, Wallingford, Pennsylvania 19086. Defendant may also be served through his counsel Gregory Johnson who represented that he represents Defendant.

## III
## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the controversy because the claims asserted in this Petition arose, in whole or in part, in Texas and the amount in controversy exceeds the minimum jurisdictional limits of this Court.

7.      This Court has jurisdiction over each Defendant because Defendants' contacts with Texas were purposefully, intentionally and affirmatively sent by Defendants to a Texan in Texas, and Plaintiffs' claims arose out of those contacts. Subjecting Defendants to jurisdiction in Texas would not offend traditional notions of fair play and justice. Defendants initiated contact with Plaintiffs by placing telephone calls and sending emails that contained statements which were fraudulent. Moreover, the statements were relied on by Plaintiffs in Texas.

8.      For example, Defendants stated that the electronic discovery searches would not cost $80,000.00, but would cost $4,000.00. Additionally, Defendants agreed to perform on the two cases Defendants were handling, but never did that work. Similarly, Defendants represented that they would not include the names of attorneys and paralegals in the electronic search terms, but they did. These representations were made after Defendants initiated contact with

Mireskandari in Texas to discuss the coordination with opposing counsel on search terms. Defendants initiated contact with Mireskandari in Texas and told him that they would procure deposition dates in the *Weinstein* case, but they never did. Defendants also represented that they would pursue offensive discovery in the *Allen* case and pursue a motion to compel, but they never did. All of these misrepresentations were made to Mireskandari in Texas.

9.     When Defendants sent unsolicited emails and telephone calls to Texas that contained the fraudulent statements, and Plaintiffs relied on those statements, Defendants subjected themselves to jurisdiction in Texas under the Long Arm Statute and Texas case law. Under Texas law, a single telephone call or email containing fraudulent statements satisfies the minimum contacts test and subjects Defendants to jurisdiction in Texas.

10.     Venue is properly laid in Harris County, Texas because the causes of action arose in whole or in part in Harris County.

## IV

## FACTUAL BACKGROUND

11.     This is a case of fraud, gross negligence, violation of the DTPA and breach of fiduciary duty arising out of a breach of contract suit asserted against Plaintiffs involving debentures. In those cases, Defendants represented Plaintiffs. In short, Defendants breached their fiduciary duties to Plaintiffs by over-charging, padding their bills for services and providing unreasonable and unnecessary charges solely to place their interests ahead of Plaintiffs' interests so that Defendants could improperly line their pockets at their clients' expense. Further, by deliberately abandoning its clients during sensitive settlement negotiations which Defendants knew would have long-term, devastating financial implications for its clients' other, intertwined cases.

3

12.     It has long been held that "[t]here are few business relations of life involving a higher trust and confidence than those of attorney and client, or generally speaking one more honorably and faithfully discharged, few more anxiously guarded by the law or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment of prejudice to the rights of the party bestowing it." *Stockton v. Ford*, 52 U.S. 232, 247 (1850). Noyes and Offit's conduct was unconscionable as a matter of law. Accordingly, this lawsuit is brought to disgorge all fees paid to Defendants and recover the damages caused by Defendants' gross incompetence in the name of morality and justice.

13.     Luxeyard has been in the online retail business since 2011, operating primarily out of its headquarters in Houston, Texas. In 2012, Luxeyard took its stock public and sold debentures to certain investors to raise capital. The terms of these debentures contained provisions that would automatically convert the investors' initial investment into shares of Luxeyard common stock. However, prior to the conversion conditions being met, a stockholder of Luxeyard, Kevan Casey ("Casey"), by his company, Jinsun, LLC ("Jinsun"), enticed the investors to call for an early, untimely "cashing in" of their investments, which would have essentially caused the stock price of Luxeyard to plummet, rendering the company insolvent. Additionally, Casey engaged in what is commonly known as a "pump-and-dump" scheme in an effort to make millions off of Luxeyard stock that he aggressively marketed, then quickly dumped shares. Casey, in retaliation for Luxeyard exposing his schemes, initiated a series of frivolous lawsuits against Luxeyard and Mireskandari designed to harass and ultimately destroy Mireskandari's reputation. Those lawsuits, and their relevance to this case, are inextricably intertwined, as will be detailed further herein.

4

14.     Mireskandari has been a business owner in the Houston, Texas area since 1983. Mireskandari sought the services and direction of Casey to help Mireskandari bring Luxeyard to the public market. Mireskandari and Casey (and Casey's associates) had several business entanglements with other companies in which Casey had held himself out have a track record of bringing private companies to the public, and then growing them exponentially. Mireskandari's reliance on Casey would ultimately prove disastrous for the many businesses he and Casey were involved in together. Casey filed many lawsuits in different states and venues that would become linked, and thus their outcomes were dependent on one another.

15.     On March 28, 2018, Casey and two other Defendants filed a lawsuit entitled *Tommy Allen, The JRG Trust and Jinsun, LLC* (Casey's company) *v. Amir Mireskandari, Ashu Ladha and Lukeyard, Inc.* (hereinafter "*Allen*") in the Court of Chancery in Delaware, at the encouragement of Casey.

16.     On April 5, 2018, Casey and six other Defendants filed a lawsuit entitled *Burton Weinstein v. Luxeyard, Inc. and Amir Mireskandari* (hereinafter "*Weinstein*") in the Superior Court for the State of Delaware, again at the encouragement of Casey, using strawman plaintiffs to bring purported "shareholder" claims.

17.     On August 30, 2018, Casey filed another lawsuit in Dallas County, Texas, entitled *LBSP v. Amir Mireskandari and Kevin Kennedy* (Mireskandari's attorney). All three of the lawsuits above are interrelated and intertwined, the outcome of each affecting the other.

18.     In 2018, Luxeyard and Mireskandari sought the services of Delaware counsel, David Finger, to represent Plaintiffs their defense of the *Allen* and *Weinstein* matters. Plaintiffs and David Finger ultimately parted ways.

19.     On February 2, 2019, Mireskandari met with Noyes at Offit in Delaware, seeking a substitution of counsel for David Finger. During that meeting, Noyes convinced Mireskandari to hire Offit to represent Plaintiffs here in thier defense of the pending lawsuit. Noyes assigned himself to be the primary and lead lawyer at Offit to represent Plaintiffs.

20.     Mireskandari was given two (2) Engagement Letters in hard copy form, one for the *Weinstein* matter and another for the *Allen* matter, and he was instructed to sign the second page of each on behalf of Luxeyard. Noyes demanded a retainer in the amount of $8,000.00, which Mireskandari and Luxeyard tendered. Mireskandari was never offered a copy of the terms and conditions referred to in those Engagement Letters prior to signing.

21.     After briefly reviewing the live complaints in Delaware, Noyes told Mireskandari that he had several decades of trial experience and knowledge in business litigation and was capable of understanding and defending debenture claims. Upon information and belief, that statement was false.

22.     Critical to this case, Mireskandari explained in detail to Noyes that the *Allen* and *Weinstein* cases in which he and Luxeyard sought representation were related to other cases pending in Texas in which Luxeyard was a party. These cases all involved a bad actor, Casey, who had previously divested Luxeyard and several other companies of income through "pump and dump" schemes.[1] Mireskandari explained that, although the other cases were seemingly separate, they all were tied together through Casey, and that timing of any settlement in any case should be handled with the utmost consideration, planning and caution.

23.     At the beginning of Offit's representation, Noyes pressured Plaintiffs to hire a specific electronic discovery service which, according to Noyes, was necessary for Noyes' staff

[1] See, *Alattar v. Casey*

to organize and categorize the volume of document production in the case. Noyes told Plaintiffs that the service would cost Plaintiffs only $4,000.00. However, this electronic discovery service (plus attorney's fees) billed Plaintiffs a huge sum of money over the next several months. Although Plaintiffs told Noyes they did not believe that electronic discovery was necessary, Plaintiffs relied on Noyes' advice and retained the electronic discovery company anyway. This ill advice cost Plaintiffs a great deal.

24.     In addition to the exorbitant fee for the electronic discovery service, in the first three months of representation, Noyes and his team spent over forty-four (44) hours reviewing the case file, instructing the support staff to upload the case file to their own database, and charging Plaintiffs for excessive phone calls to and from the electronic discovery company. Noyes and his team spent the next few months engaging in meaningless and irrelevant tasks, such as revamping key word searches, changing discovery report parameters, and communicating excessively with the electronic discovery company, which drastically increased the billable hours for Defendants, yet accomplished *nothing* in the way of substantive work product, such as dispositive motions, offensive discovery or depositions.

25.     Additionally, Defendants billed excessively for associates researching *basic legal theory*, such as attorney/client privilege and discovery procedures in New Castle County (a venue in which Noyes claims to have over 35 years of experience litigating). Offit's associates and Noyes spent countless hours researching summary judgment issues on various topics, which never produced a motion for summary judgment that was filed. Much of that time is attributed to Noyes and at least one other associate repeatedly and concurrently researching the same or similar issues of law, double-billing Plaintiffs on several days, and sometimes *on the same day*. Noyes and his team also often held several in-office meetings with all personnel, including

administrative personnel. Those meetings, which should have been considered firm overhead, generated tens of thousands of dollars in legal fees, but produced nothing. However, Noyes and the Firm unabashedly requested replenishment of the initial retainer, which Luxeyard was forced to provide for work product that was never produced. Exh. A.

26.      An April 16, 2019, The *Weinstein* Court issued a Trial Scheduling Order, outlining deadlines for the case. Mireskandari conveyed his concern to Noyes that Mireskandari did not want to miss any deadlines, and wanted aggressive defense implemented as soon as possible. Specifically, Mireskandari wanted the motion for summary judgment Noyes had previously said he was preparing completed and filed prior to the May 10, 2019 deadline set by the Court. Mireskandari expressed his concern that the motions deadline was less than a month away, but Noyes' motion for summary judgment was not ready for filing. Noyes continued to stall filing, never filed the motion, and ultimately missed the deadline. Notably, Noyes billed Plaintiffs thousands of dollars for a motion for summary judgment that he never filed. In fact, Noyes never filed *any* dispositive motions on behalf of Plaintiffs.

27.      Adding to the damages described above, Mireskandari and his Houston co-counsel repeatedly requested that Noyes designate experts, schedule their depositions and those of the *Allen* and *Weinstein* plaintiffs, but Noyes continued to stall. The deadline for Plaintiffs' Expert Reports came and went on June 28, 2019 without Noyes ever filing a designation or scheduling one deposition. Noyes failure to meet any deadline was a proximate cause  of damages to Luxeyard. But for Noyes failure to meet deadlines, Luxeyard would have prevailed in the *Weinstein* matter.

28.     Had Noyes not missed all of the deadlines, Plaintiffs would have connected the Plaintiffs in *Weinstein* (through their broker Mark Lev) to Casey and his scheme, which connection would have barred their suit pursuant to unclean hands and fraudulent inducement.

29.     Noyes also failed to amend Luxeyard's answer despite requests to include numerous affirmative defenses and remove certain admissions made by prior counsel. There is no evidence Noyes ever read the pleadings in *Weinstein*. Regardless, Noyes failed to seek leave to amend the original answer filed by Luxeyard and this reality is confirmed by the opinion recently handed down by Judge Meghan A. Adams. Had Noyes timely amended the answer, Luxeyard would not have been faced with a trial in which the elements of plaintiff's claims against Luxeyard were admitted. Factually, Luxeyard could have easily prevailed under the affirmative defenses Luxeyard asked Noyes to include in the answer. The opinion in question was handed down on March 23, 2020.

30.     Since their first meeting at Noyes' offices, Mireskandari conveyed to Noyes that he wanted a swift counter-attack with additional discovery propounded quickly on the *Allen* and *Weinstein* plaintiffs, and depositions scheduled, or at least attempted to be scheduled, of the *Allen* and *Weinstein* plaintiffs. Mireskandari also instructed Noyes that any discoverable documents served in response to discovery propounded upon Luxeyard in the *Allen* and *Weinstein* matters should be *meticulously* redacted for Mireskandari's personal information, the target of Casey's vindictive lawsuits, as the personal information could be used in the other cases. However, on more than one occasion, Noyes suggested, advised and almost inadvertently produced personal financial documents of Mireskandari. Noyes and the Offit invoiced Plaintiffs for over thirty (30) hours at the rate of $450.00 per hour for these repetitive and nonsensical

follow-up conversations and for the remediation of Defendants' errors anyway. Finally, Noyes never served any additional discovery on any of the plaintiffs.

31.     In August, 2019, Plaintiffs commenced settlement negotiations with the *LBSP* plaintiffs and with the *Allen* plaintiffs. Mireskandari reiterated to Noyes that these settlement negotiations *must* be carefully constructed as to the timing of each, amount and structure of payments, etc., because payment or settlement of one case would affect the other cases in a domino-like fashion. Plaintiffs also told Noyes that settlement was imminent in the *LBSP* Texas case, which would free Plaintiffs to pay its outstanding (but unsubstantiated) invoices to Noyes and the Firm. Amazingly, the following day, on the very eve of settlement in the Texas case, on September 5, 2019, Noyes sent Plaintiffs a Notice to Withdraw as Counsel, citing Plaintiffs refusal to pay their outstanding invoices, stating his intention to file the motion with the Delaware Court on September 5, 2019.

32.     Surprised by this turn of events, Plaintiffs responded immediately by email and attempted to contact Defendants by telephone, urging Noyes to file his withdrawal *after* settlement had been reached so that Plaintiffs' settlements in its other cases would not be adversely affected. Plaintiffs even agreed to *not* object to Noyes' withdrawal if he would withdraw *after* settlement, offering to handle all drafting and settlement negotiations through its co-counsel in Houston. However, despite Plaintiffs' argument to Noyes that his withdrawal would undermine Plaintiffs' position in other cases, Noyes filed his motion to withdraw the following morning and set the matter for hearing. As a result, opposing counsel in Plaintiffs' other cases were alerted that Plaintiffs' "quarterback" had deserted the team and that Plaintiffs' settlement position was in distress. This knowledge lessened if not negated the bargaining power Plaintiffs had in *Allen*, *Weinstein*, and the other cases.

33.     Noyes set the telephonic hearing for his Motion to Withdraw for October 9, 2019, but at the last minute, moved the hearing to a later date of October 24, 2019. During that time, due to Noyes' untimely, final-hour withdrawal, Plaintiffs were *forced* to settle two other cases involving its adversary, Casey, one for $300,000.00 and one for $150,000.00, for a total $450,00.00.

34.     On October 24, 2019, a telephonic hearing in *Weinstein* on Noyes' Motion to Withdraw was held. At the hearing, the Hon. Megan Adams, ordered Luxeyard to secure local counsel in Delaware by December 3, 2019. The Court told Plaintiffs that if they did not secure Delaware counsel by that date, she would enter for a default judgment against Plaintiffs here.

35.     Judge Adams also disallowed Luxeyard additional time to conduct discovery, including depositions of *Weinsten* plaintiffs and key witnesses that Noyes failed to conduct. In addition, Judge Adams denied Plaintiffs' request to continue the trial date of March 2020. That placed Luxeyard in an even more precarious position, as Noyes' basis for his Motion to Withdraw due to non-payment of invoices, as well as its distant location of Houston, Texas, prejudiced Plaintiffs from obtaining competent counsel in Delaware.

36.     After several weeks, some eighty telephone calls and dozens of emails sent to Delaware attorneys, Plaintiffs were able, on or about January 10, 2020, to find Delaware counsel willing to represent them. The Court's deadline for retaining Delaware counsel had expired, the November 22, 2019 deadline for discovery (including depositions) had passed, and the January 10, 2020 for dispositive motions had passed. Plaintiffs were forced to expend additional funds to secure another Delaware attorney and petition the Court to amend its pleadings and allow for additional, limited discovery. The Court's finding and orders regarding same are still pending.

37.    As a result of Noyes' gross incompetence, unethical billing practices, and unethical withdrawal during settlement negotiations, Mireskandari was forced to personally pay an additional $450,000.00 in forced settlements. Again, Mireskandari previously informed Noyes of this potential for disaster at the onset of their representation, and again several times prior to settlement negotiations. However, Noyes and Offit negligently abandoned Plaintiffs during the most crucial aspect of negotiations. Had Defendants remained on record as counsel for Luxeyard, Luxeyard would not have been forced to settle *LBSP*, *Allen* and its other, connected cases. Instead, Defendants Noyes and Offit elected to place thier own interests above its clients' interests, costing Defendants hundreds of thousands of dollars.

38.    In other words, Defendants' representation provided Plaintiffs with no benefit whatsoever. But for Noyes' incompetence and negligence, Luxeyard would have remained in a position to negotiate favorable settlements in its other related cases.

39.    Moreover, a large percentage of Noyes and Offit's billing involved billing multiple tasks as one single billing entry with only a single time amount associated with that entry. This practice, known as "block billing," is controversial as it is a known tool used to inflate fees, making it almost universally prohibited under billing standards. Rather than provide specific and singular entries for work completed, Defendants billed $79,352.25 using the controversial block billing practice. Because the block billing obfuscates the specific nature, duration, and reasonableness of the billing entry, the entries submitted using the controversial block billing method are called into question.

40.    During the course of their relationship with Plaintiffs, Defendants sent multiple timekeepers to meetings, conferences, hearings or depositions in an effort to churn fees at Plaintiffs' expense. Rather than bill only for the active timekeeper's presence, many instances of

duplicative billing occurred. There were a number of entries where timekeepers billing over $450.00 per hour repeated the same tasks, and there were some instances where they duplicated their efforts on the same day. These inefficient practices resulted in more than sixty (60) hours of billed work and over $27,000.00 in fees for Plaintiffs.

41.     Further, for a client to properly evaluate the reasonableness and necessity of all time and expense entries, the charges should be billed with sufficient clarity, detail and timeliness, with the nature of the task preformed and the reason for performance. There were multiple instances of Defendants providing Plaintiffs with billing entries that fail to sufficiently describe the work performed and fail to identify the purpose of the work completed. The questionable and vague billing entries regarding communications, preparation, and general tasks submitted by Defendants total over $28,000.00.

42.     Moreover, rather than bill administrative and clerical work as overhead, Defendants instead billed Plaintiffs over $10,900.00 for clerical work, including calendaring dates, instructing subordinates including law clerks and secretaries, uploading documents, and receiving assignments from supervisors. Defendants also billed for numerous internal communications between office staff and attorneys.

43.     Defendants boast as being "well-equipped to serve domestic and international clients in the following categories" (they list thirty categories).[2] As shown above, Defendants gross incompetence, inefficient billing practices and fee churning resulted in Plaintiffs being forced to settle two connected cases in the amount of $450,000, and pay $45,000.00 in legal fees and expenses to Defendants and for which they should not have been responsible. Worse, after churning literally more than $120,000.00 dollars in attorney's fees, Noyes and Offit sent a

---

[2] https://www.offitkurman.com/attorney/frank-e-noyes-ii/

demand letter to Plaintiffs in an effort to strong arm payment for representation that flunked the standard of care and that never resulted in any discovery, motions, amended pleadings, or attempts at settlement negotiations in any of Luxeyard's cases. This was not the "well equipped" representation that Plaintiffs had in mind when they hired the services of Offit and Noyes.

44.     Plaintiffs also seek a substantial recovery of the $45,000.00 paid to Offit because of its improper invoicing resulting in inflated legal bills.

45.     As a result of the misrepresentations and fraud by Noyes during the signing of the Engagement Letters, Plaintiffs are entitled to punitive damages.

46.     Further, due to Offit's and Noyes' fraud and breach of their fiduciary duties, Plaintiffs seek the disgorgement of all fees and expenses paid to Defendants as said fees were obtained through fiduciary breaches, fraud and deceit. Thus, but for Offit's and Noyes' unreasonable advice and incompetence, Plaintiffs were unable to reap the benefits of the agreement with Defendants regarding their pending cases.

## V
## STATEMENT OF CLAIMS

47.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if set forth fully herein.

48.     It has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiffs due to Defendants' conduct. Specifically, Defendants' conduct constitutes negligence, breach of the duty of fair dealing and/or breach of fiduciary duty, fraud and violates the Texas Deceptive Trade Practices Act (DTPA).

### A.     NEGLIGENCE

49.     Defendants' conduct constitutes negligence. In addition to the allegations constituting negligence outlined above, the following errors and/or omissions:

Noyes is responsible for:

- Failure to protect Plaintiffs' interest;

- Failure to properly represent Plaintiffs; and

- Failure to diligently represent Plaintiffs.

Of course, nothing Plaintiffs did, or failed to do, caused or in any way contributed to cause the occurrences that resulted in losses and damages to Plaintiffs. On the contrary, the Defendants fell below the standard of care for attorneys practicing law, and thus, Defendants' conduct was a proximate and/or producing cause of Plaintiff's losses and damages.

**B.    BREACH OF DUTY OF FAIR DEALING AND BREACH OF FIDUCIARY DUTY**

50.    Defendants' self-dealing conduct constitutes breach of fiduciary duty. Defendants owed Plaintiffs fiduciary and other duties as a matter of law by virtue of the attorney/client relationship, including the following:

- Duty of loyalty and utmost good faith;

- Duty to refrain from self-dealing, which extends to dealings with persons whose interests are closely identified with those of the fiduciary;

- Duty to act with integrity of the strictest kind;

- Duty to properly bill;

- Duty not to churn fees;

- Duty of fair, honest dealing;

- Duty of full disclosure; that is, a duty not to conceal matters that might influence a fiduciary to act in a manner prejudicial to the principal;

- Duty to represent Plaintiff with undivided loyalty;

- Duty to act with absolute perfect candor, openness, honesty, and without any concealment or deception no matter how slight;

- Duty to make a full and fair disclosure of every facet regarding the attorney/client relationship; and

- Duty to fully and fairly provide information requested by Plaintiff regarding billings and expenses in order for Plaintiff to make fully informed decisions regarding potential settlements.

Defendants intentionally breached one, some, or all of the above fiduciary duties. These breaches of fiduciary duty proximately caused damages to Plaintiffs and/or an improper benefit to Defendants.

**C.    FRAUD AND FRAUD BY NONDISCLOSURE**

51.    Defendants are liable to Plaintiffs for fraud or, alternatively, fraud by non-disclosure. At the time Plaintiffs agreed to retain the services for the underlying matter, these Defendants represented to Plaintiffs that the lead attorney, Noyes, was an aggressive trial attorney with several decades of experience with debentures, and that the Engagement Letters signed by Plaintiffs were representative of the entire contract. These representations were material and false.

52.    As outlined above, Defendants made numerous representations to Plaintiffs and the facts outlining the representations above are realleged here. Defendants knew that these representations were false at the time they were made, or Defendants made them recklessly, as a positive assertion, and without knowledge of their truth. Defendants made these representations with the intent that Plaintiffs rely on them and Plaintiffs did rely on them by signing the Engagement Letters, and paying to Defendants a large retainer so that Defendants could begin work immediately on Plaintiffs' matters. The representations, and Plaintiffs' reliance on them, caused Plaintiffs damages in that they were deprived of choice of law, the inability to refute inflated invoices after thirty (30) days, or the right to demand that Defendants services be retained when sensitive settlement negotiations were imminent.

**D.     DTPA**

53.     Plaintiffs allege Defendants conduct violated subsections 5, 7, 9 and 24 of §17.46(b) of the Texas Deceptive Trade Practices Act ("DTPA"). Such conduct was a proximate cause of damages to Plaintiffs. Defendants' conduct was also unconscionable under the DTPA. Plaintiffs seek actual damages, consequential damages, treble damages, and attorneys' fees pursuant to the DTPA.

## VI
## DAMAGES

54.     Regarding the causes of action and conduct alleged above, Plaintiffs have sustained pecuniary losses that were proximately caused by Defendants' conduct. Plaintiffs hereby seek the maximum allowable of actual damages that are within the jurisdictional limits of this court and exceed $1,000,000.

**A.     ACTUAL DAMAGES**

55.     Plaintiffs seek actual damages in the approximate amount of $450,000.00 due to Defendants' misconduct. In addition, Plaintiffs seek actual damages in the amount of fees they paid to Defendants because their services were rendered worthless and because of Defendants' breaches of fiduciary duty.

**B.     PUNITIVE AND TREBLE DAMAGES**

56.     Plaintiffs sue to recover punitive damages arising out of Defendants' intentional breach of fiduciary duty and fraud. Taking into consideration the nature of the wrong, the character of the conduct involved, the degree of culpability of Defendants, the situation and sensibilities of the parties concerned, the extent to which such conduct offends a public sense of justice and propriety, and the net worth of Defendants, Plaintiffs are entitled to punitive damages.

57.     Additionally, Plaintiffs will show by clear and convincing evidence that Defendants acted with malice because their acts and omissions were either with a specific intent to substantially injure Plaintiffs or, when viewed objectively from the standpoint of Defendants at the time of the occurrences in question, involved an extreme degree of risk, considering the probability and magnitude of harm to Plaintiffs, and of which Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiffs. Plaintiffs seek treble damages under the DTPA.

**C.     FEE FORFEITURE**

58.     Due to Defendants' intentional breach of fiduciary duty as well as their fraudulent conduct, as outlined above, Plaintiffs are entitled to the complete disgorgement of all attorneys' fees paid to Defendants.

**D.     ATTORNEY'S FEES**

59.     Plaintiffs seek attorney's fees for the violations of the DTPA.

**VII**
**JOINT LIABILITY**

60.     At all times material hereto, Defendants represented Plaintiffs in the legal matters described herein. At all times material hereto, all of the specific acts complained of herein are attributable to the conduct of the individual attorneys associated with their respective law firms as partners, agents, servants, representatives and/or employees. Thus, the liability and responsibility of Defendants is vicarious, and joint and several, and further, Plaintiffs plead the legal theory of *respondeat superior* as between the individual lawyer named herein and Offit. Further, Defendants are jointly liable for each other's conduct because they agreed to engage in a joint venture or general partnership with regard to the underlying case and undertook joint responsibility for Plaintiffs' cases.

## VIII
## JURY DEMAND

61.    Plaintiffs request to have a jury decide this case and makes this formal request pursuant to Texas Rule of Civil Procedure 216. This request is filed more than thirty days before this case has been scheduled for trial and all fees have been paid.

## IX
## REQUEST FOR DISCLOSURE

62.    Plaintiffs request that Defendants disclose, within 50 days of the service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

## X
## NOTICE OF INTENT TO USE PRODUCED DOCUMENTS

63.    Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, each party is hereby given notice of Plaintiffs' intent to use any and all documents produced by any and all parties at any pretrial hearing, deposition, proceeding, the trial of this matter, or any combination.

## XI
## PRAYER

WHEREFORE, Plaintiffs pray that after trial herein, that judgment be entered against Defendants jointly and severally as prayed for, that costs of court be taxed against Defendants, that Plaintiffs be given prejudgment as well as post judgment interest, and for such other and further relief, at law and in equity to which Plaintiffs may show themselves to be justly entitled, to which the Court believes Plaintiffs to be deserving, and for which Plaintiffs pray.

19

Respectfully submitted,

**THE KASSAB LAW FIRM**

_____

**LANCE CHRISTOPHER KASSAB**
Texas State Bar No. 00794070
lance@kassab.law
**DAVID ERIC KASSAB**
Texas State Bar No. 24071351
david@kassab.law
1214 Elgin Street
Houston, Texas 77004
Telephone: (713) 522-7400
Facsimile:  (713) 522-7410

**ATTORNEYS FOR PLAINTIFF**